N.C. Dep't of Revenue v. Asphalt Emulsion Indus., LLC, 2026 NCBC 5.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV040734-910

NORTH CAROLINA DEPARTMENT
OF REVENUE,

Petitioner,

v.

ASPHALT EMULSION
INDUSTRIES, LLC,

Respondent.

**ORDER AND OPINION ON PETITION
FOR JUDICIAL REVIEW**

1.     This matter is before the Court on a Petition for Judicial Review filed by petitioner North Carolina Department of Revenue ("**DOR**"). (ECF No. 3). DOR seeks review of a Final Decision by Summary Judgment issued by an Administrative Law Judge ("**ALJ**") in favor of respondent Asphalt Emulsion Industries, LLC ("**AEI**") on 21 November 2024 (the "**Final Decision**"). (ECF No. 17, R_015653–015661).

2.     In the Final Decision, the two issues before the ALJ were (i) whether AEI's "transfers of finished emulsion product to affiliated entities were 'sales' subject to North Carolina sales tax" (the "**Transfers**"), and (ii) whether AEI "is a 'retailer' for the purpose of the Sales and Use Tax Act." (R_015653).

3.     In resolving these issues, the ALJ granted in part and denied in part each side's cross-motions for summary judgment. As to the Transfers, the ALJ determined that the Transfers of emulsion products and materials by AEI "to members of its affiliated group are not subject to sales tax," such that AEI is not required to pay sales tax to DOR on those transfers under N.C. Gen. Stat. § 105-164.1,

*et seq*. (R_015659). The ALJ therefore granted AEI's motion, and denied DOR's motion, for summary judgment as to that issue (the "**Transfer Issue**"). (R_015659).

4. As to AEI's status as a "retailer" under the Sales and Use Tax Act, the ALJ determined that AEI was a retailer under the statute and that AEI was required to obtain a certificate of registration and to file sales and use tax returns during the periods at issue as a result (the "**Retailer Issue**"). (R_015659). The ALJ thus granted DOR's motion, and denied AEI's motion, for summary judgment as to the Retailer Issue. (R_015659).

5. With its petition, DOR contends that the ALJ erred in granting AEI's motion, and denying DOR's motion, for summary judgment as to the Transfer Issue and asks the Court to reverse the Final Decision on that basis. (ECF No. 3 at 16 (requesting that the Court "set aside and reverse that portion of the Final Decision which denies the Department's motion for summary judgment")). Conversely, AEI contends that the ALJ's Final Decision "was well-reasoned and correct, after a thorough examination of the evidence presented before her" and that there were no taxable events between AEI and its affiliates. (ECF No. 32 at 27).

6. Neither side contests the portion of the Final Decision granting DOR's motion and denying AEI's motion for summary judgment as to the Retailer Issue. (ECF No. 3 at 16; *see generally* ECF No. 11). Accordingly, that issue is not before the Court, and this Order therefore addresses only that portion of the Final Decision granting AEI's motion and denying DOR's motion for summary judgment with respect to the Transfer Issue.

7. The Court held a hearing on the petition on 29 August 2025, (ECF No. 34), at which all parties were represented by their counsel of record.

8. Having considered the petition, all appropriate matters of record, and the written and oral arguments of counsel for the parties, the Court determines that summary judgment was appropriate and that the Final Decision should be **AFFIRMED** as to the Transfer Issue.

> *North Carolina Department of Justice by Jonathan Neil Wike for Petitioners North Carolina Department of Revenue*
>
> *Carruthers & Roth, P.A. by Robert Young and Craig T. Almond for Respondent Asphalt Emulsion Industries, LLC*

Houston, Judge.

## BACKGROUND

9. Sitting in an appellate capacity, the Court does not make findings of fact but summarizes the case's procedural history and certain undisputed background facts for context. *See Shepherd v. Consol. Jud. Ret. Sys.*, 89 N.C. App. 560, 562 (1988). The Court's ultimate determinations in this action would be the same if no background were set out.

10. Petitioner DOR is a state agency responsible for administering and collecting taxes imposed under N.C. Gen. Stat. § 105-164.1, *et seq.* (the "**Tax Act**").

11. Respondent AEI is a single member North Carolina limited liability company. (R_000051, 144). From at least 1 June 2015 through 31 May 2021 (the "**Audit Period**"),[1] AEI operated a facility in Dunn, North Carolina, where its

---

[1] Though DOR and the Final Decision at various times reference the audit period as 1 May 2015 through 31 May 2021, (ECF No. 28 at 1; R_015654 at ¶ 6), DOR's Notice of Final

employees manufactured asphalt emulsion product ("**Emulsion Product**"), a material used in road construction. (R_000138–39).

12. AEI's sole member and parent company is Slurry Pavers, Inc. ("**SPI**"), a Virginia corporation. (R_000016). SPI is a road paving and road construction company based in Virginia that constructs roads, primarily in Virginia and North Carolina. (R_000051).

13. In addition to AEI, SPI has several other wholly owned subsidiaries, each of which is involved in SPI's road paving and construction business. (R_000145). SPI's other subsidiaries include Whitehurst Paving Company, Inc. ("**WPC**"), Morehead Asphalt Company, LLC ("**MAC**"), and Whitehurst Transport Company, Inc. ("**WTI**"). (R_000145). All of the entities are treated as disregarded entities for purposes of federal and state income tax purposes. (R_000144–45).

14. During the Audit Period, MAC acquired and produced base asphalt raw materials. (R_000005). WTI or third-party transporters shipped those raw materials from MAC to AEI, with AEI generally paying for hauling services. (R_000143–144). In turn, AEI used the raw materials to produce Emulsion Product, which was then shipped to SPI and WPC for use in road construction. (R_000137–47).

15. Each year, at SPI's direction, AEI transferred the majority of its Emulsion Product to SPI and WPC, (R_000146), though AEI also sold Emulsion Product to unrelated third party during the Audit Period. (R_000146–147).

---

Determination reflects the "Tax Period" at issue as "6/1/15-5/31/21." (R_000051). Regardless of this discrepancy, which appears to be a scrivener's error, the factual circumstances are substantively the same, and, between the two, the specific date is not otherwise material for purposes of this Order and Opinion.

16. AEI's Transfers to its parent and affiliate were not negotiated or bargained-for transfers and were instead made at the direction of SPI, as the parent company, or WPC, an affiliate, with AEI transferring Emulsion Product at no cost. (R_000146, 201–203).

17. AEI did not invoice SPI or WPC, and neither SPI nor WPC paid AEI the hypothetical markup prices of the Emulsion Product being transferred as part of the Transfers. No payment obligations were created, nor were purchase orders or bills of sale issued. (R_000201–203). As AEI's and SPI's corporate designee affirmed, "AEI essentially produces and gives the product to [SPI.]" (R_000201 at 72:18 and 72:25 ("That's correct.")).

18. In light of this process and the parties' corporate structure, SPI maintained accounting records for itself and its subsidiaries and affiliates in a construction industry software program called Vista, which is operated by a single accounting team responsible for each entity's financial reporting. (R_000153, R_000466–67, R_000473–75).

19. The Vista program is generally used to record accounting transactions, including job cost, accounts payable, payroll, inventory, prices, revenue, accounts receivable, and other information input by clerks at SPI. (R_000150–52).

20. For AEI's and SPI's purposes, Vista "records all accounting transactions from job cost to accounts payable to payroll to accounts receivable to general ledger," plus inventory, prices, and revenue. (R_000150–51 at 21:24–22:11).

21.     When AEI made Transfers to SPI and WPC, the transactions were recorded in Vista, with Vista's inventory and job cost figures immediately adjusted for AEI. (R_000150–52, 201–03, 466–67, R_000473–74). However, AEI did not send invoices to SPI or WPC or otherwise expect profit based upon those accounting entries. (R_000201–03).

22.     In the course of documenting those Transfers, an entry was generally made in the Vista program to reflect a "due to"/"due from" dollar amount entry. (R_000158–62, 201–03, 274–77). During the Audit Period (except the month of May 2021), the "due to"/"due from" amount listed in Vista for the Transfers was the amount that AEI estimated SPI would have paid if it had purchased the finished Emulsion Product from an unrelated third party (i.e., a hypothetical price based on a purchase from someone other than AEI). (R_000201–03).

23.     These hypothetical prices were not reported to DOR or used in calculating tax returns and, instead, were maintained at least primarily, if not entirely,[2] for internal bookkeeping, business management, and accounting purposes. (R_000201–03). Because the hypothetical markup did not reflect actual amounts paid or transferred, SPI and WPC did not pay the markup amount to AEI, and the

---

[2] The overall Vista program was at times "used to process data entries for all of the SPI entities in the group for both internal management reporting and external financial reporting requirements." (R_000217; *see also* R_00194)). DOR argues that, because the overall Vista program as a whole could be used for external reporting, this necessarily means that the hypothetical "due to"/"due from" entries—discrete data points in the system—were also used for external reporting. (ECF No. 33 at 8). The otherwise unrebutted evidence of record, however, indicates that the hypothetical markups were for internal accounting and management purposes and were not reported to DOR or otherwise used for material external purposes. (*Compare* R_0000168 (hypothetical amounts), *with* R_000153–55, 194 (Vista as a whole)).

Emulsion Product was ultimately reported for tax purposes as being transferred at cost rather than at the hypothetical markup amount. (R_000167–72, 178, 192, 197, 201–03, 274–275).

24. As a result, for purposes of paying sales and use tax and submitting tax returns, AEI and SPI calculated "the cost of the internal transfers . . . and report[ed] that to the North Carolina Department of Revenue." (R_000169 (A: "[T]hat cost is determined by the raw materials that go into it. And that is the number that we record for sales tax purposes.").

25. As a result, during the Audit Period, SPI (rather than AEI) ultimately paid taxes on Emulsion Product based on these raw material costs and not based on the higher amounts of the hypothetical markups recorded in Vista. (R_000052, 145–46).

26. In light of the companies' organizational structure, AEI received various services and purported cash infusions from SPI at times, and SPI provided centralized accounting and management services for AEI. (R_000430). Further, SPI directly paid payroll expenses for AEI's employees. (*See* R_000443).

27. SPI or its other subsidiaries also provided AEI with lump sums of cash from time to time, though the lump sums of cash were not expressly tied to AEI's Transfers to SPI or WPC. (*See* R_15559; *see also* R_000288).

28. During the Audit Period, SPI included all its North Carolina business activities and all the North Carolina business activities of its disregarded subsidiaries, including AEI, in filing North Carolina sales and use tax returns or

reports under SPI's Certificate of Registration. (R_000051–52). AEI was not separately registered to pay sales and use taxes before the Audit Period, but it was registered for such payments after the Audit Period. (R_000145–46).

29. Beginning around May 2021, the Vista "due to"/"due from" amounts were updated to list only the cost to AEI of raw materials used to make the product and to eliminate the hypothetical markup. (*E.g.*, R_000281–83).

30. Thereafter, following an audit, DOR concluded that SPI "erroneously treated [AEI] as a division" of SPI for sales and use tax purposes, that the Transfers to SPI and WPC "were reduced to cost even though those transactions were recorded in [AEI's] accounting software reflecting a retail sale price plus tax," and that AEI therefore owed additional sales and use tax for the Transfers it made to SPI and WPC. (R_000051–56).[3] In essence, DOR determined that, because the Transfers among affiliated companies were documented by the hypothetical markup and because AEI was a separate LLC (even if disregarded for purposes of federal and state income taxes), sales and use taxes were due on those related-party Transfers. (R_000052).

31. DOR issued a Notice of Final Determination on 28 September 2023, assessing substantial additional taxes against AEI for the Transfers, (R_000051–56), and AEI timely filed a Petition for a Contested Tax Case Hearing before the Office of Administrative Hearings on 20 November 2023, (R_000013–30).

---

[3] In the Notice of Final Determination, DOR calculated $1,358,261.38 in state and county taxes due, $814,956.84 in penalties, and interest through 20 October 2023 of $387,376.15, totaling $2,560,594.37. (R_000024).

32.     In the course of that contested case, the ALJ issued the Final Decision on 21 November 2024. As noted above, the ALJ (i) granted AEI's motion for summary judgment as to the Transfers at issue and determined that they were not "sales" within the meaning of the Tax Act, such that they were not taxable, and (ii) granted DOR's motion for summary judgment and determined that AEI is a "retailer" for purposes of the Tax Act in light of its sales of Emulsion Product to third parties. (R_015653–660).

33.     Thereafter, DOR filed its petition in this action on 20 December 2024, (ECF No. 3).

34.     On 30 December 2024, the matter was designated as a complex business case pursuant to § 7A-45.4(b)(1), and, on 21 February 2025, it was assigned to the undersigned Business Court Judge. (ECF Nos. 1, 8).

35.     Following full briefing by the parties and a hearing at which the parties were represented by their counsel of record, this matter is now ripe for resolution.

## ANALYSIS

### I.     Standard of Review

36.     Review of a final decision of an administrative agency is governed by N.C. Gen. Stat. § 150B-51.

37.     For most administrative appeals, § 150B-51 provides that the reviewing Superior Court may affirm the decision, remand it for further proceedings, or reverse or modify it if the "substantial rights of the petitioners may have been prejudiced" because the decision was "(1) [i]n violation of constitutional provisions; (2) [i]n excess

of the statutory authority or jurisdiction of the agency or administrative law judge; (3) [m]ade upon unlawful procedure; (4) [a]ffected by other error of law; (5) [u]nsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or (6) [a]rbitrary, capricious, or an abuse of discretion." *Id.* § 150B-51(b).

38. Purported errors under subsections (1)–(4) are reviewed under a *de novo* standard of review, while those under subsections (5)–(6) are reviewed under a "whole record" standard of review. *Id.* § 150B-51(c).

39. However, in reviewing a petition for judicial review arising from a final decision granting summary judgment, § 150B–51(d) applies. *Id.* § 150B-51(d). ("In reviewing a final decision allowing judgment on the pleadings or summary judgment, the court may enter any order allowed by G.S. 1A-1, Rule 12(c) or Rule 56.").

40. In such a case, as here, the issue is "whether summary judgment was properly granted," and "the correct standard of review remain[s] *de novo.* Thus, the question before the trial court [is] whether there [are] any genuine issues of material fact and whether any party [is] entitled to judgment as a matter of law.*" York Oil Co. v. N.C. Dep't of Env't, Health & Nat. Res.*, 164 N.C. App. 550, 555 (2004) (citations omitted); *Krueger v. N.C. Crim. Just. Educ. & Training Standards Comm'n*, 198 N.C. App. 569, 576–77 (2009) (noting that the court "follow[s] § 150B–51(d) and appl[ies] the standard established by Rule 56 of the Rules of Civil Procedure: whether 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that any party is entitled to a judgment as a matter of law'" (citation omitted)); *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 2015 NCBC LEXIS 92, *15–16 (N.C. Super. Ct. Oct. 7, 2015).

41.     Here, DOR identifies various bases on which it contends that the Final Decision was erroneous under § 150B–51(b). For example, DOR excepts to a number of the ALJ's recitations of undisputed facts (which DOR incorrectly frames as "Findings of Fact"),[4] contending that they are erroneous, not supported by the record, or are otherwise incomplete. (ECF No. 3 at 9–12). Similarly, DOR excepts to various of the ALJ's conclusions of law, contending that they were erroneous as a matter of law. (ECF No. 3 at 12–16).

42.     But under § 150B–51(d), the Court need not consider or resolve those assertions. Even if the ALJ's reasoning for granting summary judgment were incorrect as DOR argues,[5] as a matter of law, the issue for this Court is "whether there were any genuine issues of material fact and whether any party was entitled to judgment as a matter of law." *York Oil Co.*, 164 N.C. App. at 555; *Midrex Techs.*, 2015 NCBC LEXIS 92, at *15-16.

---

[4] The ALJ  did not make findings of fact but permissibly "summarize[d] material facts [she] consider[ed] to be uncontested" in an "Undisputed Facts" section of the Final Decision. (R_015654–56); *see, e.g.*, *Hyde Ins. Agency, Inc. v. Dixie Leading Corp.*, 26 N.C. App. 138, 142 (1975).

[5] While DOR contends that the ALJ "got the wrong result for the wrong reasons," (Hr'g Tr. 19:23–19:24 (Aug. 29, 2025)), the ALJ's reasoning is irrelevant, and "[s]ummary judgment is affirmed if correct on any ground, regardless of the [ALJ's] reasoning." *City of Roanoke Rapids v. Halifax Cnty.*, – N.C. App. –, 920 S.E.2d 417, 2025 N.C. App. LEXIS 648, *6 (2025) (citation omitted); *see also Shore v. Brown*, 324 N.C. 427, 428 (1989).

43. Applying the summary judgment standard, the Court concludes that there is not and was not a genuine issue of material fact and that AEI was entitled to summary judgment as to the Transfer Issue. (R_015653).

44. In this proceeding, DOR contends that the ALJ incorrectly concluded that AEI's transfers were not supported by consideration and that, therefore, no taxable sales occurred. (ECF No. 28 at 10–20). Specifically, DOR asserts that (i) the "due to"/"due from" entries recorded in Vista constituted consideration received by AEI, (ECF No. 28 at 11–15), (ii) SPI's general provision of accounting services to AEI, SPI's payment of AEI's payroll, and the general cash infusions made by SPI also constituted consideration for Emulsion Product, (ECF No. 28 at 15–17), and (iii) the Transfers are necessarily sales supported by consideration if they are not otherwise gifts, (ECF No. 28 at 18–20).

45. Conversely, AEI argues that the Final Decision should be affirmed because there was no consideration for the Transfers and, thus, no "sale." (ECF No. 32 at 7–20). Specifically, AEI asserts that the "due to"/"due from" entries reflected purely hypothetical markups, did not reflect actual sales, and were used only for recordkeeping purposes. (ECF No. 32 at 11–16). Further, AEI notes that the general cash infusions and various payments from SPI were not specifically tied to Emulsion Product Transfers. (ECF No. 28 at 16–18).

## II. Sales Under the Tax Act

46. The Tax Act imposes, among other things, state-level sales and use taxes. N.C. Gen. Stat. §§ 105-164.1 *et. seq.*; *see N.C. Dep't of Revenue v. FSC II, LLC,*

2023 NCBC LEXIS 16, \*12 (N.C. Super. Ct. Jan. 30, 2023) (providing background discussion of Tax Act), *aff'd*, 386 N.C. 110 (2024).

47. Under the Tax Act, the terms "Sale" and "Selling" mean, in relevant part, "[t]he transfer for *consideration* of title, license to use or consume, or possession of tangible personal property or certain digital property or the performance for consideration of a service." N.C. Gen. Stat. § 105-164.3(235) (emphasis added).

48. The term "consideration" is undefined in the Tax Act.

49. In such situations, "[u]ndefined words are accorded their plain meaning so long as it is reasonable to do so," and, in determining a word's plain meaning, North Carolina courts have "'used standard, nonlegal dictionaries as a guide.'" *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258 (2016) (citations and internal punctuation omitted); *Surgical Care Affiliates, LLC v. N. Carolina Indus. Comm'n*, 256 N.C. App. 614, 621 (2017) ("When a statute employs a term without redefining it, the accepted method of determining the word's plain meaning is not to look at how other statutes or regulations have used or defined the term—but to simply consult a dictionary." (citation omitted)).

50. The ordinary meaning of compensation is generally (i) "recompense" or "payment," as in "a *consideration* paid for legal services," or (ii) "the inducement to a contract or other legal transaction"—"*specifically*: an act or forbearance or the promise thereof done or given by one party in return for the act or promise of another." *Consideration*, § 6(a), *Merriam-Webster*, https://www.merriam-webster.com/dictionary/consideration (last visited Jan. 20, 2026) (emphasis in original);

*Consideration*, § 8(a), *Dictionary.com*, https://www.dictionary.com/browse /consideration (last visited Jan. 20, 2026) (defining "consideration" as "something that suffices to make an informal promise legally binding, usually some value given in exchange for the promise"); *see also* Consideration, *Webster's Third New International Dictionary* 484 (Philip B. Gove *et al*. eds. 2002) (similar definitions).

51. This meaning comports with the definition of consideration recognized by our appellate courts in the context of contracts: any bargained-for "benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Davis v. Woods*, 286 N.C. App. 547, 562 (2022) (noting also that, "[t]o constitute consideration, a performance or a return promise must be bargained for" (citation and internal quotation marks omitted)).

52. In that context, "[a] performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Chem. Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood*, 84 N.C. App. 27, 30 (1987) (quoting Restatement (Second) of Contracts § 71).

53. This means that "the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise *and* the promise induces the furnishing of the consideration," such that "the promise and the consideration *must purport to be the motive each for the other, in whole or at least in part*[.]" *Id.* at 31 (citation omitted); *see Albemarle Educ. Found., Inc. v. Basnight*, 4 N.C. App. 652, 654 (1969) (discussing reciprocity requirement).

54.     The undisputed evidence reflects that neither SPI nor WPC paid AEI the hypothetical markup amounts for Emulsion Product Transfers or provided any similar payment, promises, or other value with respect to the Transfers. Nonetheless, DOR advances three primary arguments in support of its contention that there was consideration for the Transfers or that the Transfers are otherwise subject to sales tax. The Court addresses each of those arguments in turn.

### a. <u>Due To/Due From Entries in Vista</u>

55.     DOR first contends that the intangible "due to"/"due from" accounting entries reflecting hypothetical markups in Vista constitute consideration, even without a corresponding transfer of funds. Neither the ordinary meaning of the term nor applicable case law supports DOR's argument.

56.     <u>Accounts Receivable</u>. As its primary line of argument at the hearing, DOR contended that the entries themselves are "accounts receivable" that constitute consideration for the Transfers. (Hr'g Tr. 5:20–11:11 (Aug. 29, 2025)).

57.     The term "accounts receivable" is "'ordinarily understood to be an amount owed from one person to another usually arising from the sale of goods or rendering of services and not supported by negotiable paper'" or a note, whether "negotiable or not." *Guilford Mills, Inc. v. Powers*, 327 N.C. 279, 281 (1990) (quoting *Moore & Van Allen v. Lynch*, 61 N.C. App. 601, 602 (1983)) (determining, in a tax case, that amounts owed to factors were not accounts receivable). For example, in *Moore & Van Allen*, cited with approval by the Supreme Court, the Court of Appeals determined that transactions shown on a balance sheet were accounts receivable

because they were "the recognition of *revenues to be received*" and that the taxpayer "was *owed something* for" work it had done. *Moore & Van Allen*, 61 N.C. App. at 602 (emphasis added).

58.     Here, however, the undisputed facts of the case are that neither AEI, nor SPI, nor WPC ever agreed to create any reciprocal transfer obligation (whether by payment, transfer of other goods, or otherwise) specifically in return for AEI's Transfers of Emulsion Product. There was nothing "owed" to AEI, and there were undisputedly no revenues to be received. DOR's argument that the accounting entries constituted accounts receivable merely based on their labeling does not align with the parties' treatment of the hypothetical markup entries or the definition of an account receivable.

59.     <u>Virginia Department of Revenue Letter</u>. In further support of its argument, DOR contends that this Court should adopt the reasoning in a decision by the Virginia Department of Revenue[6] in which that agency determined that, under Virginia law, "intercompany accounting entries to record transactions between related but separate entities constitute a consideration for sales and use tax purposes." PD 16-84, Commonwealth of Virginia, 2016 WL 3226281, at *2 (Va. Dept. Tax. May 17, 2016).

---

[6] In a footnote, DOR cites in passing a South Carolina Department of Revenue letter for the proposition that "a transfer of cash is not necessary for consideration to exist." (ECF No. 28 at 13 n. 5 (citing *Sales Between Related Entities (Sales and Use Tax),* SC Private Letter Ruling No. 04-3, S.C. Dept. Rev., 2004 WL 5460961, at *1)). The issue here, however, is not merely the lack of a cash transfer specifically but the lack of *any* negotiated or bargained-for exchange that is specific to the Transfers and the hypothetical markup, whether mutual promises, tangible products, cash, or otherwise.

60. This Court, of course, is not bound by the self-interested, agency level determinations of a neighboring commonwealth's Department of Revenue and, in this instance, does not find the decision persuasive. The Virginia Department of Revenue's letter decision was premised on Virginia's sales tax statute, not North Carolina's, and, though the two have similarities, they are not identical. *Compare* Va. Code § 58.1-602, *with* N.C. Gen. Stat. § 105-164.3(235).

61. Moreover, state and federal agencies are not entitled to deference in interpreting or construing applicable law, even in the context of ambiguous statutes. *Savage v. N.C. Dep't of Transp.*, 388 N.C. 196, 202 (2025) ("*Chevron* deference is not permissible when interpreting state law, and it never was." (citations omitted)); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (overruling earlier *Chevron* deference case law and noting that "[c]ourts must exercise their independent judgment" in evaluating applicable law); *see also Mitchell v. Univ. of N.C. Bd. of Governors*, 388 N.C. 341, 347 (2025) (noting that, while courts may consider an agency's interpretation of its own regulations, those interpretations are not binding on courts).

62. And, most importantly, the Virginia Department of Revenue in large part based its decision *not* on the legal definition or meaning of "consideration" but on (i) a prior proceeding in which it treated "accounting entries that recorded [asset] transfers [as] a consideration" with no substantive discussion of the reasoning, and (ii) a mere *possibility* that the parties' financial reporting might "produce more

appealing results for shareholders, potential investors and commercial lenders." PD 16-84, Commonwealth of Virginia, 2016 WL 3226281, at *2.

63.     In this matter, the undisputed evidence shows that AEI and SPI or WPC did not (i) derive any material benefit from the hypothetical markups reflected in the "due to"/"due from" entries, or (ii) bargain for or negotiate any promises, forbearances, or other responsibilities or obligations specific to the Transfers and hypothetical markups.

64.     No Payment of "Due To"/"Due From" Amounts. It is undisputed that the hypothetical markup amounts reflected in the "due to"/"due from" entries were never paid, and there is no evidence that AEI expected to be paid, or that SPI or WPC intended to pay, the amounts reflected by the markup entries. (Hr'g Tr. 7:23–25 (acknowledging that "[t]here is not" any competent evidence of record that those amounts "were ever paid")).

65.     There is similarly no evidence that the Vista entries were used to obtain third-party investors or to obtain similar value from the use of the entries. (Hr'g Tr. 44:1–47:8).

66.     Thus, the Court concludes that the "due to"/"due from" entries alone do not constitute or otherwise suffice as consideration.

   b. **Cashflow to/Services for AEI**

67.     DOR further contends that the various avenues of cashflow from SPI to AEI, including payment of salaries and payroll and provision of inventory, and other general "cash infusions," constitute consideration for the Transfers. (ECF No. 28 at

15–17).

68.     It is undisputed that SPI, as a parent company, provided cash infusions to AEI, provided accounting services that encompassed AEI's accounting needs, paid payroll expenses for AEI's employees, and otherwise largely treated AEI as a division of SPI rather than as an independent entity. (*See, e.g.*, R_000288, 430, 443, 15659).

69.     If the matter before the Court were one involving an attempt to pierce AEI's corporate veil, such facts might support that remedy. *See, e.g., State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 441 (2008) (discussing requirements for piercing). But piercing is not the issue before the Court. The matter before the Court is whether there is a genuine issue of material fact as to the Transfer Issue—i.e., as to whether the Transfers were "transfer[s] *for* consideration" and otherwise met the definition of taxable "sales." N.C. Gen. Stat. § 105-164.3(235) (emphasis added).

70.     The requirement that a transfer be "for" consideration necessarily means that it is linked to the consideration. *See For*, §§ 3 and 8, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/for (last visited Jan. 20, 2026) ("because of" or an "equivalence in exchange"); *For*, §§ 4 and 8, *Dictionary.com*, https://www.dictionary.com/browse/for (last visited Jan. 20, 2026) ("in order to obtain, gain, or acquire" or "in consideration or payment of; in return for").

71.     The record lacks any evidence that the Transfers were made at the hypothetical markups "for" the separate cash infusions, the accounting services, or other items or services provided by SPI to AEI. The undisputed facts demonstrate

that SPI, as a parent company, provided cash infusions to AEI, provided accounting services that encompassed AEI's accounting needs, paid payroll expenses for AEI's employees, and otherwise largely treated AEI as a division of SPI rather than as an independent entity. (*See, e.g.*, _000288, 430, 443, 15659).

72. Other than the facts that SPI was AEI's parent company and ultimately benefited from keeping AEI operational generally, there is no evidence that the cash infusions, services, or support that SPI provided as a parent company were provided "for" the specific Emulsion Product Transfers at the hypothetical markup rates.

73. As DOR conceded at the hearing, there is no evidence of an agreement, understanding, negotiation, bargain, or other *quid pro quo* between the parties for such transactions. (Hr'g Tr. 12:25–13:2 ("[W]e do not have evidence that they met and said, 'Is this for this?'"); 10:2–10:3 (acknowledging lack of evidence and suggesting that evidence of specific bargained-for exchanges is "unrealistic")). DOR also does not appear to argue that the cash infusion amounts were proportional to the Transfers.

74. Instead, DOR argues that the Transfers "couldn't have been for anything else," such as keeping a subsidiary afloat, and that, even absent supporting evidence, AEI *must* have been providing the Transfers in return for SPI's generalized cash infusions, accounting services, and other benefits. (Hr'g Tr. 11:8–11:11 ("We submit that it couldn't have been for anything else."); *see generally* Hr'g Tr. 10:19–17:21).

75. This argument and the undisputed facts do not align with the plain language of the Tax Act or the meaning of the phrase "for consideration," as necessary

to establish that there were taxable sales. N.C. Gen. Stat. § 105–164.3 (clarifying that each "sale" is a "transfer supported by consideration").

### c. Presumption of Sale and Consideration

76. Finally, DOR argues that the Transfers are presumed not to be gifts and that, if they are not gifts, they necessarily must be sales. (ECF No. 28 at 18–20).[7] The Court disagrees.

77. Citing *Tucker v. Mecklenburg Cnty. Zoning Bd. of Adjustment*, 148 N.C. App. 52 (2001), DOR relies on a false dichotomy: that a transfer must be either a gift or a sale. (ECF No. 28 at 18–20).

78. But, in *Tucker*, the Court of Appeals simply quoted the dictionary definitions of "sale" and "gift" in the context of determining whether a nonprofit dog rescue organization was a commercial kennel that made "sales" of dogs by transferring them to adoptive owners. *Id.* at 54. In affirming a zoning board's determination that adoptive families were not "equivalent to 'storage for sale' as set forth in the definition of a commercial kennel," the Court of Appeals compared the definitions of "sale" and "gift" and noted that adoptive families were not required to

---

[7] The ALJ determined that the Transfers were "distributions" from AEI, as an affiliate, to SPI, as its parent company, a determination that DOR disputes. (R_015658–59). The Court need not, and does not, reach this issue, which represented non-binding and non-determinative *dicta* by the ALJ after determining no taxable sale occurred. *DeLoy v. Lekowski*, – N.C. App. –, 921 S.E.2d 218 (2025) ("Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are *obiter dicta*, and lack the force of an adjudication." (internal punctuation and citations omitted)); *see GRE Props. Thomasville LLC v. Libertywood Nursing Ctr., Inc.*, 235 N.C. App. 266, 274 (2014) (clarifying that *dicta* need not be reviewed because it is "unnecessary to the Court's determination that a genuine issue[] of material fact" did or did not exist). As counsel for both sides appeared to concede at the hearing, what the Transfers *were* is irrelevant; what they were *not* (i.e., taxable sales) is the relevant determination for resolving the Transfer Issue on appeal.

give any money for adoption of dogs. *Id.* at 59. Thus, the court determined that the adoptions were gifts and not sales because there was no exchange of money or similar consideration. *Id.* The *Tucker* court did not, however, determine that a transfer of tangible property necessarily must be either a gift or sale. *See generally id.*

79.     Indeed, as DOR conceded at the hearing, "if the [Transfers a]re . . . not gifts, there's so many other things they could be," (Hr'g Tr. 24:7–8), whether leases, loans, pledges as collateral for secured transactions, or even distributions, as the ALJ found.

80.     Even without the limited dichotomy of a sale or gift, DOR argues that this Court should follow the lead of Louisiana courts and *infer* that consideration exists because "businesses do not generally give away their assets." (ECF No. 28 at 19 (citing *Columbia Gulf Transmission Co. v. Bridges*, 28 So.3d 1032, 1042 (La. App. 1 Cir. 2009)).

81.     A diligent search of North Carolina case law reveals no similar presumption in this state, and the Court declines to adopt it here. *Copeland v. Amward Homes of N.C., Inc.*, 269 N.C. App. 143, 147–148 (2020) (Lower courts are "not in the position to expand the law. Rather, such considerations must be presented to our Supreme Court or our Legislature." (quoting *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126 (2012))).

82.     Considering the nature of the business relationships at issue, the Court therefore declines to presume that the Transfers at issue were made for consideration in the absence of supporting evidence.

## CONCLUSION

83. Considering all competent evidence of record on a *de novo* review and applying the plain language of N.C. Gen. Stat. § 105-164.3(235), the Court determines that there are no genuine issues of material fact and that summary judgment is and was appropriate in favor of AEI as to the Transfer Issue. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs. LLC*, 365 N.C. 520, 523 (2012) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" (quoting N.C. R. Civ. P. 56(c))).

84. Accordingly, the Court **AFFIRMS** the Final Decision as to the Transfer Issue, and, pursuant to N.C. Gen. Stat. § 150B–51(d), **GRANTS** summary judgment in favor of AEI as to the Transfer Issue.[8]

**SO ORDERED**, this the 21st day of January 2026.

/s/ Matthew T. Houston

Matthew T. Houston
Special Superior Court Judge
for Complex Business Cases

---

[8] This Order and Opinion does not address those portions of the Final Decision that were not presented on appeal, including the Retailer Issue, (R_015659), nor does the Court necessarily approve or adopt the legal reasoning of the Final Decision, particularly the *dicta* as to the alleged nature of the Transfers as "Distributions," by affirming the ultimate result of summary judgment. *See* N.C. Gen. Stat. § 150B-51(d) (standard of review); *GRE Props. Thomasville*, 235 N.C. App. at 274; *see also York Oil Co*, 164 N.C. App. at 555; *Krueger*, 198 N.C. App. at 576–77.